**REAL ESTATE INVESTORS FOUR, INC., f/k/a Nusrala Four, Inc., Plaintiff/Respondent,**

v.

**AMERICAN DESIGN GROUP INC., Defendant/Appellant,**

**and**

**American Design Properties, Inc., Defendant.**

**No. ED 77614.**

Missouri Court of Appeals, Eastern District, Division Five.

April 3, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 10, 2001.

Application for Transfer Denied June 26, 2001.

Michael J. McKitrick, Danna McKitrick, P.C., St. Louis, MO, for respondent.

Eugene Portman, Wrenn Terrill Kates, St. Louis, MO, for appellant.

KATHIANNE KNAUP CRANE, Judge.

Plaintiff lessor filed a lawsuit against both its lessee and the actual occupant of its leased premises, on an alter ego theory, for non-payment of rent and other charges and for damages for failure to maintain the leased property in good order and repair. After a bench trial, the trial court entered a joint and several judgment against both defendants in the amount of $54,116.73. The occupant appeals. It contends that the trial court erred by entering a judgment against it because plaintiff failed to prove the elements necessary to recover on an alter ego theory. It also argues that the action was barred by the statute of

limitations and the statute of frauds. We affirm.

### FACTUAL BACKGROUND

*The Parties*

Plaintiff, Real Estate Investors Four, Inc., is a Missouri corporation which was formerly known as Nusrala Four, Inc. (hereinafter "Nusrala Four"). It is the owner of a shopping center at 8602–8606 Olive Boulevard in St. Louis County.

Defendant and appellant, American Design Group, Inc. (hereinafter "Group"), is a Missouri corporation engaged in the business of wholesale distribution of fashion jewelry, gift items, and other merchandise. Since its incorporation it has been wholly owned by J.H. Blum. Marvin Blum, who is J.H. Blum's husband, and Matthew Smith, who is Marvin Blum's ex-son-in-law, are also involved in the business.

Group, Marvin Blum, and Smith have each made conflicting claims identifying Group's officers. On its 1988 Annual Registration Report filed with the Secretary of State, Group reported that J.H. Blum was the president, vice president, secretary, treasurer, and director. Group's answers to interrogatories, dated October, 1999 stated that J.H. Blum was and had been president since inception. However, Marvin Blum testified in November, 1999, as the corporate representative of Group, that he was president of Group, had held that position for several years, and had previously been vice president of Group. He testified that J.H. Blum held the other corporate offices, including vice president and treasurer. Smith testified that he had been general manager of Group since 1989 and also had held the position of vice president for several years. Group paid a salary to Smith.

Defendant, American Design Properties, Inc. (hereinafter "Properties"), was incorporated on June 13, 1989 and was adminis-tratively dissolved on December 31, 1992, for failing to file its Annual Registration Report. The administrative dissolution was rescinded on October 1, 1997. Properties was formed to sublease property.

Properties, Marvin Blum, and Smith also contradicted each other about the identity of Properties' officers. On its 1998 Registration Report, Properties reported J.H. Blum was the president, vice president, secretary, treasurer, and director. However, Properties' answers to interrogatories, signed in October, 1999, stated that Smith had been president, secretary and general manager since inception. Smith, who testified as the corporate representative of Properties, testified that he has been the only officer and director of Properties. Properties' answers to interrogatories also stated that occasionally Marvin Blum acted and signed as an officer of Properties. However, Marvin Blum testified that he was not and had never been an owner, employee, officer, or director of Properties.

Smith testified that he owned Properties. However, Smith testified that he has no stock certificate showing his ownership of the company, nor any records evidencing a purchase. Properties indicated in its answers to interrogatories that J. Blum had an ownership interest in Properties, which it did not define, and that "Matt Smith owns 100% since inception."

Properties has never had any bank accounts or any employees. Properties has no money and no revenue. Properties has never filed any federal or state income tax returns. It has no financial statements. Properties never conducted any business other than, as described below, to collect from Group the exact amount of rent Properties owed under the lease and turn the money over to the lessor. Properties

has never held directors' or shareholders' meetings and has no minutes.

*The Lease*

In 1990, Elizabeth Torno, as lessor, and Properties, as lessee, entered into a commercial lease (the lease) of shopping center property "for no other purpose or business than that of retail and/or wholesale use of furs and/or jewelry and/or other fashion items" for a five-year term commencing July 1, 1990, with an option for an additional five-year term. The lease cancelled, as of July 1, 1990, a prior lease between the parties dated May 24, 1989. The lease was not assignable and prohibited subletting without the written consent of the lessor. Marvin Blum signed the lease as vice president of Properties. In 1995 Nusrala Four acquired the property and became the lessor[1] under the lease. In August, 1997, the lease was amended to extend the term from July 1, 1995 to June 30, 2000 and to give Properties the right to terminate the lease upon 120 days' written notice. Marvin Blum signed the amendment on behalf of Properties. Marvin Blum also had telephone conversations with representatives of the lessor and the president of Nusrala Four.

Group was the actual occupant of the premises for the entire period. Group advanced funds to Properties to pay the monthly rent through October, 1998. Neither Smith nor Blum notified the lessor that Properties was subleasing the property. Smith and Blum agreed that Properties had not executed any sublease or assignment agreements, but Blum testified there was a verbal agreement.

Nusrala Four did not know that Group was the actual occupant of the premises. Nusrala Four received rent payments through November, 1998. However, unlike the previous payments, the November, 1998 rent payment was made by means of a check drawn on the account of Group signed by Smith. This was the first time that Nusrala Four heard of Group or saw a check with that name on it. Nusrala Four did not receive any further rent payments after November, 1998 and no maintenance payments for the year ending December 31, 1998 or thereafter. On February 26, 1999 Nusrala Four received an envelope containing the keys to the premises and a note on stationary imprinted "From the desk of Marvin D. Blum" which bore the handwritten entries: "American Design Properties" and "WE have vacated the property at 8604 Olive. Enclosed are the keys." Nusrala Four had not received a notice of termination prior to February 26, 1999. Upon entering the property, Nusrala Four discovered damage to the interior of the leased premises.

*PROCEDURAL BACKGROUND*

Nusrala Four filed a lawsuit against Group and Properties on March 15, 1999. As amended, the petition sought damages from Group and Properties for breach of contract, and from Group in quantum meruit, for unjust enrichment, and for damages resulting from failure to maintain the leased premises in good repair. It also sought damages from Group as the alter ego of Properties.

At trial Nusrala Four called two witnesses, its president, who testified to the lease and the amounts owed, and a contractor, who testified to the physical damage to the premises. It also introduced portions of the depositions of Marvin Blum and Smith, which had been taken on No-

---

1. In this opinion the "lessor" will be used to collectively refer to the original and successor lessors.

vember 29, 1999, interrogatory answers filed by Group and Properties in October, 1999, as well as other exhibits. Group and Properties did not put on any evidence. At the conclusion of the trial, the trial court entered judgment in favor of plaintiff and against Group and Properties on the breach of contract claim against Properties, the failure to maintain and repair claim against Group, and the alter ego claim against Group, jointly and severally, in the amount of $54,116.73, which included damages, interest, and attorney's fees.

Only Group appeals. It claims that there was insufficient evidence to establish alter ego liability and that the alter ego claim was barred by the Statute of Limitations. It alternatively argues that the action was barred by the Statute of Frauds.

## DISCUSSION

Because this was a court-tried case, we review pursuant to the standard set out in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the trial court's judgment unless there is no substantial evidence *to support it*, unless it is against the weight of the evidence, or unless it erroneously declares or misapplies the law. *Id.*

### I. *Alter Ego*

■ For its first point Group contends that the trial court erred by entering a judgment against Group because Nusrala Four failed to prove each of the elements necessary to recover on an alter ego theory, namely control, wrongdoing, fraud, or improper conduct, and proximate cause.

■ Ordinarily, courts protect the separate legal identities of individual corporations. *Collet v. American Nat. Stores, Inc.*, 708 S.W.2d 273, 283–84 (Mo.App. 1986). However, there are situations in which one corporation shows such domination and control over another that the lat-

ter corporation becomes an adjunct or alter ego of the first. *Id.* at 283–84. "In such a situation, when the formal corporate separateness and the arrangements between the two corporations is devised or used to accomplish a fraud, injustice, or some unlawful purpose, then the separate formal corporate structures will be ignored." *Id.* at 284.

■ To "pierce the corporate veil" and hold one corporation liable for the acts of another corporation, a plaintiff must show:

1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

2) Such control must have been used by the corporation to commit fraud *or* wrong, to perpetrate the violation of statutory or *other positive legal duty*, or dishonest and *unjust* act in contravention of plaintiff's legal rights; and

3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo. banc 1999), citing *Collet.*

■ To determine whether one corporation has exercised control over another under the above test, we evaluate the degree of control the dominant corporation holds over the subordinate corporation by considering several factors, which include:

(1) The parent corporation owns all of most of the capital stock of the subsidiary.

(2) The parent and subsidiary corporations have common directors or officers.

(3) The parent corporation finances the subsidiary.

(4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.

(5) The subsidiary has grossly inadequate capital.

(6) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(8) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(9) The parent corporation uses the property of the subsidiary as its own.

(10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(11) The formal legal requirements of the subsidiary are not observed.

*Collet,* 708 S.W.2d at 284.

■ Application of the *Collet* factors demonstrates that Group exercised the requisite control over Properties. In all of the contradictory scenarios about who were officers of the two corporations, there was substantial overlap. According to their official filings, J.H. Blum was the sole officer and director of both corporations. Marvin Blum, who claimed to be an officer of Group, signed documents as an officer and representative of Properties, although he denied under oath that he was an officer, owner, or employee of Properties. Smith, a salaried employee, general man-

ager, and vice president of Group, claimed to be the only officer and director of Properties.

Properties had no capital, assets, revenues, business, bank accounts, or employees, and paid no salaries. Its sole function was to be the named lessee of the premises on the lease and receive from Group and pay over to the lessor the monthly rent under the lease. This rent was its only expense. The formal legal requirements for Properties' existence as a corporation were not observed. Properties was administratively dissolved for almost 5 years. Persons other than the person listed as the sole officer on the corporate record filed with the state acted as or testified that they were officers. Marvin Blum, who claimed to be an officer of Group and not of Properties, dealt with the lessor as a representative and officer of Properties. Group occupied the premises leased by Properties as though it were the lessee without a written assignment or sublease and without any disclosure of its occupancy. Sufficient evidence supported a finding that Group controlled the finances, policy and business practices of Properties with respect to the lease such that Properties had no separate mind, will, or existence of its own.

■ Next we must determine if Group used its control to commit a fraud or wrong, perpetrate the violation of a statutory or other legal duty, or unjustly act in contravention of Nusrala Four's legal rights. *Collet,* 708 S.W.2d at 284. Actual fraud is not required to justify piercing the corporate veil; violation of statutory duties or undercapitalization may be sufficient. *66, Inc.,* 998 S.W.2d at 41. "Inadequate capitalization is circumstantial evidence tending to show an improper purpose or reckless disregard for the rights of others." *Id.* " 'Inadequate capitalization' means assets that are very

small in comparison to known risks associated with the planned corporate enterprise." *Id.* Whether a corporation's capitalization is adequate depends on the business of the particular corporation and is generally measured at the time of incorporation. *Id.* " 'Making a corporation a supplemental part of an economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others.' " *Id.*, citing *May Department Stores Co. v. Union Electric Light & Power Co.*, 341 Mo. 299, 107 S.W.2d 41, 55 (1937).

Here, there was sufficient evidence from which the trial court could conclude that Properties was inadequately capitalized. Smith claimed to own Properties, but had no documents to show he had invested or paid anything for his ownership interest. Smith admitted the corporation had no money. It received no money other than the monthly rent payment that Group advanced to it and that it turned over to lessor.

Further, there was also sufficient evidence to show Group used its control to commit fraud. Marvin Blum signed the lease as an officer of Properties, but testified he was not. He signed the lease amendment on Properties' behalf, and notified Nusrala Four of the termination. Group was the actual occupant of the property although it was not a party to the lease. Properties' principals never notified the lessor that Group was the occupant or that the claimed oral sublease had been made. Properties never occupied the premises itself or conducted the business contemplated by the lease.

Inadequate capitalization and fraud is significant in the context of this lease because the lease was of commercial property to a lessee for the purpose of operating a particular business thereon. Instead the lessee, which had the financial obligations under the lease, did not conduct the business. The occupant which conducted the business had no legal relationship with the lessor.

Group relies on cases from other jurisdictions to support its argument that the lessor in this case cannot recover because it voluntarily entered into a contract with a corporation without investigating its solvency or protecting itself against default. This principle has questionable validity if the *Collet/Crestwood Commons* factors are properly applied and has no viability in the context of this case. In the first place, this case not only falls squarely under *Collet*, it also represents a more egregious situation. In *Collet* the lessee defaulted on a lease when the lessee abandoned the premises without paying its obligations under the lease. We found its parent corporation liable as an alter ego because of its control over and inadequate capitalization of the lessee. In *Collet* the lessee was the actual occupant of the premises and conducted the business thereon. In this case, however, the lessee was not even the actual occupant of the premises or conducting the contemplated business thereon but was merely a conduit for rent not engaged in any business. There was affirmative misrepresentation, failure to disclose facts which required disclosure under the lease, and undisclosed breach of other lease provisions by which the controlling corporation, which was not the lessee, occupied the premises and carried on its own business thereon.

Last, we consider whether Group's control of Properties proximately caused the injury and loss to Nusrala Four. When the action of the dominant corporation renders the subservient corporation insolvent, the requisite injury and

causal connection is established. *Collet*, 708 S.W.2d at 287. Group created and maintained Properties in an insolvent condition for the sole purpose of being the named lessee of premises to be used by Group. Since Properties was not the actual occupant of the premises conducting a business thereon, but was an insolvent shell, it could not pay its obligations under the lease upon default. Proximate cause was established.

Point one is denied.

## Statute of Limitations

■ For its second point Group contends that the trial court erred in not dismissing Nusrala Four's alter ego claim as untimely under Section 516.120 RSMo (1994), because the act on which Nusrala Four bases its claim occurred more than five years ago.[2] Group argues that the act upon which liability was based is the incorporation of Properties in 1989.

■ Nusrala Four's alter ego claim is based on its breach of contract claim for unpaid rent and failure to maintain the premises and return them in good order and repair. These claims did not arise until Properties failed to pay the rent due in December, 1998 and thereafter and vacated the premises in damaged condition. A cause of action for breach of contract does not accrue until after the contract is breached. "The triggering event of the applicable statute of limitations is when damage is sustained and becomes capable of ascertainment." *Business Men's Assur. Co. of America v. Graham*, 984 S.W.2d 501, 507 (Mo. banc 1999). The damage in this case was not sustained until February 26, 1996 when the property was vacated in damaged condition without payment of rent and maintenance charges. The law-

suit filed on March 15, 1999 was clearly within the statute of limitations. The trial court did not err in not dismissing the lawsuit on this ground. Point two is denied.

## Statute of Frauds

■ For its third point Group alternatively contends that the trial court erred in granting judgment in favor of Nusrala Four because the statute of frauds, Section 432.010 RSMo (1994) bars Nusrala Four's recovery because there was no written instrument evidencing Group's liability.

■ Group's two sentence argument does not preserve this point for review. "Arguments raised in the points relied on which are not supported by argument in the argument portion of the brief are deemed abandoned and present nothing for appellate review." *Faith Baptist Church of Berkeley, Inc. v. Heffner*, 956 S.W.2d 425, 426 (Mo.App.1997). An appellant must develop the contention raised in the point relied on in the argument section of the brief or the point is not preserved. *Id.* Point three is denied.

The judgment of the trial court is affirmed.

MARY K. HOFF, C.J., and ROBERT O. SNYDER, Sr. J., concur.

---

2. The parties also disagree on whether the appropriate statute of limitations is five or ten years. We do not need to address this issue because, for the reasons which follow, the petition was filed within five years.