**Richard NUNN; Respondent**

**Treasurer of the State of Missouri–Custodian of the Second Injury Fund, Defendant,**

v.

**C.C. MIDWEST, Appellant.**

**No. WD 64027.**

Missouri Court of Appeals,
Western District.

Dec. 21, 2004.

Elizabeth C. Carver, St. Louis, MO, for Appellant.

John R. Stanley, Overland Park, KS, for Respondent.

Before LISA WHITE HARDWICK, P.J., ROBERT G. ULRICH and THOMAS H. NEWTON, JJ.

THOMAS H. NEWTON, Judge.

Mr. Richard Nunn was a truck driver for C.C. Mid West. He was injured while making a delivery and claimed workers' compensation benefits. C.C. Mid West asserted that he was not entitled to those benefits because he was an owner-operator of his truck and an independent contractor. The Labor and Industrial Relations Commission (Commission) found that Mr. Nunn was not an owner-operator and was an employee, not an independent contractor. Because he leased the truck, and used it under a lease-purchase agreement, we find that he did not own the truck. Also, under the right to control test, we find that Mr. Nunn was an employee rather than an independent contractor. Therefore, we affirm the Commission's decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

C.C. Mid West, Inc. is a for-hire or contract motor vehicle carrier operating under certificates issued by the federal Department of Transportation (DOT). C.C. Mid West is a wholly-owned subsidiary of Central Transport International, Inc., which is a wholly-owned subsidiary of CenTra, Inc.

Mr. Nunn is a truck driver, and on November 15, 2000, he met with C.C. Mid West's Kansas City, Missouri, terminal manager, Mr. Patrick Hilke, to discuss driving for C.C. Mid West. Mr. Nunn claims that he completed employment applications at this meeting. C.C. Mid West maintains that he was being hired as an independent contractor. He actually only filled out a Contractor Data Sheet, which specifically stated that he "confirm[ed] that I am representing myself as an Independent Contractor.... I acknowledge that I am not applying for, nor, am I being offered employee status by this data sheet." Mr. Hilke told Mr. Nunn that he needed to get a DOT drug screen and a physical, and told him what clinics were DOT certified.

During the November 15, 2000, meeting, Mr. Nunn told Mr. Hilke that he did not have a vehicle appropriate for the type of hauling that he would be doing for C.C. Mid West. Just before applying with C.C. Mid West, Mr. Nunn had been an independent contractor/owner-operator truck driver for USF Distribution, but after he left USF someone else took over the payments on and ownership of his truck. Mr. Hilke informed Mr. Nunn about a truck leasing company called GLS Leasco, Inc., which might have a truck available for Mr. Nunn to lease-purchase. GLS Leasco is a wholly-owned subsidiary of CenTra, Inc. Mr. Nunn expressed interest in getting a truck from GLS Leasco, and a lease was arranged. The lease was sent to C.C. Mid West's office in Kansas City for Mr. Nunn to sign and a copy of the lease was placed in Mr. Nunn's file.[1] C.C. Mid West maintains that Mr. Nunn could have gotten a truck from anywhere, and that Mr. Hilke simply made this suggestion because Mr. Nunn expressed a need for a truck. Mr. Nunn claims that he was given no choice in which truck he eventually received and

---

1. Mr. Hilke also testified that some of the other drivers had trucks leased through GLS Leasco, while others got their trucks elsewhere. Mr. Hilke did acknowledge that he did not have copies of any of the other drivers' leases, but he claimed that was only because GLS Leasco had sent Mr. Nunn's lease to his office and that had not occurred with the other drivers.

that he never saw the truck until after the lease was signed on January 2, 2001. Because GLS Leasco did not have a truck available right away, C.C. Mid West arranged for Mr. Nunn to go to St. Louis to temporarily rent a truck. Once GLS Leasco had a truck for Mr. Nunn, C.C. Mid West arranged for him to go to Chicago to retrieve it.

On December 6, 2000, Mr. Nunn and C.C. Mid West entered into a Non–Exclusive Operating Agreement with Independent Contractor (Agreement). C.C. Mid West claims that this Agreement 1 specifically disclaims any employer-employee relationship. Mr. Nunn claims that he was being hired as an employee of C.C. Mid West and he did not read the Agreement before signing it. The Agreement states that C.C. Mid West is "Company" and Mr. Nunn is "Contractor" and a corporation. The Agreement then states that he owns the equipment described in Schedule A, which was the truck that he eventually leased from GLS Leasco, although he had not yet signed that lease when he signed the agreement. The first numbered paragraph of the Agreement was titled "Independent Contractor" and it stated:

> Contractor shall furnish Contractor's services as an Independent Contractor and not as an employee of Company or any subsidiary or affiliate of Company. Contractor and its employees or agents shall not be considered an agent, representative, associate, assignee or employee of Company at any time, for any purpose or reason whatsoever. Contractor, its employees, representatives, agents, assignees, associates, or affiliates (whomever has some relation with Contractor) have no power or authority to act for, represent, or bind Company or any subsidiary or affiliate of Company in any manner whatsoever. Contractor and its employees or agents are not entitled to any medical coverage, life insurance, participation in Company's savings plan, and/or other benefits afforded to Company's regular or irregular employees, or those of any subsidiary or affiliate of Company. . . .

The Agreement also requires the Contractor not to engage in any business that conflicts with the Company's interests. The Agreement states that it is non-exclusive with the Contractor, stating that the Company will, on a non-exclusive basis, tender to Contractor various loads of freight for pick-up, hauling, and delivery, but is not obligated to do so. The Agreement requires Contractor to furnish a vehicle, keep it in good operating condition, and pay for all maintenance. It states that Contractor has the sole right to hire and terminate all its employees and exercises all control over those employees, and that Company has no right to exercise any control or supervision over those employees except to the ultimate completed pick-up or delivery. The Agreement can be terminated at Company's sole and only discretion for any reason whatsoever. Either party can cancel with thirty days written notice and in the first ninety days of the Agreement the Company can cancel without any notice. With respect to workers' compensation insurance, the Agreement states that:

> It is further mutually understood and agreed by the parties that Contractor shall provide evidence for worker's compensation insurance in effect covering all employees and agrees to hold Company harmless and indemnify it for and against any loss, cost or expense, including but not limited to, court costs and attorney's fees, arising out of or with respect to injury to, or death of, including but not limited to, Contractor or any of its employees, agents, associates, representatives, or servants.

The Agreement also set out the rate of pay in an attached schedule: payment based on the weight of what was hauled and the mileage driven.

Mr. Nunn signed the Tractor[2] Lease with GLS Leasco on January 2, 2001, receiving the truck mentioned in the Agreement. The lease states that unless the Lessee (Mr. Nunn) exercises his right-to-purchase option, "at all times during the term of the Lease, no title to Tractor shall vest in Lessee." Lessee must also affix to the truck in a conspicuous place, decals or signs showing Lessor (GLS Leasco) as the owner and lessor of the truck. The lease requires Lessee to inform Lessor in writing of any subleases and if the truck will be used outside of Kansas or Missouri. The Lessee may not make any changes to the truck without prior written consent of the Lessor and the Lessee must keep the truck in good repair at his own expense through the duration of the lease, including bearing the entire risk of loss. The lease is called a lease-purchase agreement because Mr. Nunn had an option to purchase the truck:

> Lessee shall, upon thirty (30) days prior written notice to Lessor, have the option to purchase Tractor from Lessor by paying to Lessor in cash the Stipulated Value as of the date of closing and title transfer.... Unless Lessee shall have purchase [sic] Tractor as provided herein, Tractor shall be returned to Lessor in accordance with Section 10 hereof.

And the Lessor has the right to cancel the lease upon seven days' prior written notice to Lessee.

Mr. Nunn began driving for C.C. Mid West and on a typical day he would arrive at the C.C. Midwest terminal at 6:30 or 7:00 am. He would be given a list of stops for the day and his truck would be loaded with all the goods for delivery. Mr. Nunn claims that Mr. Hilke decided how to load the trucks, resulting in him setting out the route that would be followed. Mr. Hilke, on the other hand, claims that each truck driver determined how he wanted his truck loaded based on the deliveries for that day and the truck was loaded accordingly. C.C. Mid West had no policy requiring the drivers to call in during the day, but the drivers could call in if they wished to find out about any pick-ups while they were out or more deliveries at the terminal. The drivers were also not required to wear any uniforms, but they were encouraged to wear a uniform and would receive a bonus incentive for doing so. The drivers filled out daily worksheets tracking their deliveries for the day, including their time spent on each delivery. These worksheets were how the drivers invoiced C.C. Mid West and Mr. Hilke stated that the time portion was filled in only for billing the customer, which in no way influenced how the drivers were paid.

Mr. Nunn believed that he was not allowed to haul for any other companies and that he was required to report to C.C. Mid West every day and could not decline a haul unless there was someone else to cover it. C.C. Mid West maintains that Mr. Nunn was free to haul for anyone else and that he was always free to decide whether or not to accept a haul. C.C. Mid West points to various parts of the Agreement that say that it was non-exclusive. Regardless of what the rules were, Mr. Nunn did not haul for anyone else during the time that he hauled for C.C. Mid West and he did not turn down any jobs unless there was someone else to cover them.

---

**2.** Tractor and truck are used interchangeably to describe the vehicle driven by a truck driver.

On January 7, 2002, Mr. Nunn was making a delivery to Sally's Beauty Supply Store. He claims that while unloading the trailer, a heavy box started to fall and he reached to grab it. After he caught the box, he immediately felt a sharp pain in his back and tingling down his legs. He advised Mr. Hilke of the incident, although, according to C.C. Mid West, he was not required to do so. Mr. Nunn tried to make other deliveries after the accident, but due to worsening symptoms he had difficulty finishing his runs. He asked Mr. Hilke about workers' compensation benefits and was handed a typewritten paper stating that he could purchase his own workers' compensation insurance. Mr. Nunn claims that this is the first time that he was told that it was his responsibility to procure his own workers' compensation insurance. In March 2002, he sought medical treatment and received some anti-inflammatory medication and some steroid injections. He also had an independent medical examination performed by Dr. Edward Prostic.

Mr. Nunn filed a claim for workers' compensation naming C.C. Mid West as his employer. He alleged permanent total disability. A hearing was held before an administrative law judge (ALJ), who determined that there was no evidence of an employment relationship between Mr. Nunn and C.C. Mid West. The ALJ held that Mr. Nunn was not entitled to any workers' compensation benefits since he was an owner-operator and an independent contractor, and because C.C. Mid West was not his statutory employer.

The Commission reversed the decision and found that because the lease was with a sister corporation of C.C. Mid West and could be cancelled with only seven days' notice, it was not an arm's length contractual agreement and did not transfer any ownership of the truck to Mr. Nunn.

Therefore, Mr. Nunn was not an owner-operator. The Commission also found that C.C. Mid West exercised control over Mr. Nunn in several instances and treated Mr. Nunn like an employee, including retaining the right to discharge him and doing so. The Commission found that "truck transport was the regular business of C.C. Mid West and that Mr. Nunn was performing this service." Further, although the Agreement stated that Mr. Nunn was an independent contractor, the Commission found that based on the conduct of the parties, he was not an independent contractor. The Commission then decided that he had sustained a compensable injury.

C.C. Mid West appeals the Commission's finding. C.C. Mid West asserts two points on appeal. It first claims that the award was in error because the facts show that Mr. Nunn was an owner-operator and was exempt from coverage under the Workers' Compensation Act (Act). It then claims that even if Mr. Nunn was not an owner-operator, the award was still in error because the facts show that he was an independent contractor and not an employee, and that C.C. Mid West was not his statutory employee either.

## II. Standard of Review

The Commission's decision is upheld if it is supported by competent and substantial evidence on the whole record. *DiMaggio v. Johnston Audio/D & M Sound,* 19 S.W.3d 185, 188 (Mo.App. W.D. 2000) (overruled on other grounds by *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 223, 225 (Mo. banc 2003) (overruling numerous cases to the extent that they hold that section 287.495.1 requires a reviewing court to view the evidence and all reasonable inferences therefrom in the light most favorable to the workers' compensation award)).

The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1.[3] "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton*, 121 S.W.3d at 223. "This standard would not be met in the rare case when the award is contrary to the overwhelming weight of the evidence." *Id.*

▮▮▮ We defer to the Commission on issues of fact, but questions of law are reviewed de novo. *Endicott v. Display Technologies, Inc.*, 77 S.W.3d 612, 615 (Mo. banc 2002). "A finding that a worker's compensation claimant is or is not an employee represents an application of law, not a finding of fact...." *DiMaggio*, 19 S.W.3d at 188.

## III. LEGAL ANALYSIS

### A. The Owner–Operator Exception

▮▮ C.C. Mid West first complains that the Commission erred in finding that Mr. Nunn was not an owner-operator and, therefore, exempt from application of Workers' Compensation Law. Under the Act, the word employee is defined, in pertinent part, as follows:

shall not include an individual who is the owner and operator of a motor vehicle which is leased or contracted with a driver to a for-hire common or contract motor vehicle carrier operating within a commercial zone as defined in section 390.020 or 390.041, RSMo, or operating under a certificate issued by the motor carrier and railroad safety division of the department of economic development or by the interstate commerce commission.

§ 287.020.1.

"Section 287.020.1, by its terms, merely excludes from the definition of employee an individual: (1) who is the owner and operator of a motor vehicle which is (2) leased or contracted with a driver (3) to a for-hire common or contract motor vehicle carrier operating within a commercial zone...." *Booth v. Trailiner Corp.*, 21 S.W.3d 869, 874 (Mo.App. S.D.2000). The only part of this definition at issue is whether or not Mr. Nunn was the owner of the truck that he drove; both parties acknowledge that the other elements are met. The Commission found that he was not the owner for two reasons: the lease "is initially suspect because it is with a sister corporation to the employer rather than an independent leasing company" and the cancellation provision, allowing the lessor the right to cancel with seven days' notice, nullifies any option-to-purchase rights that Mr. Nunn might have. As a result, the Commission found that no ownership interest was transferred to Mr. Nunn under the lease and he was only an operator. Therefore, the owner-operator exception did not apply to him.

▮▮ C.C. Mid West asserts that the Commission's finding that the lease was deficient because GLS Leasco was related to C.C. Mid West is without foundation. Although GLS Leasco and C.C. Mid West are related corporations—the same corpo-

---

**3.** Unless otherwise indicated, all statutory references are to RSMo. (2000).

ration that owns GLS Leasco owns C.C. Mid West's parent company—there is no other evidence of a connection between the two companies. As C.C. Mid West correctly asserts, separate corporations are considered to be distinct legal entities, even if the stock of one is partially or fully owned by the other. *Mid–Mo. Tel. Co. v. Alma Tel. Co.*, 18 S.W.3d 578, 582 (Mo. App. W.D.2000). So the fact that GLS Leasco and C.C. Mid West are related is not enough of a reason to find that Mr. Nunn's contract with GLS Leasco is not arm's length. Only when one corporation shows such domination and control over the other, such that the latter is merely the alter ego of the first, do we ignore the separate legal identities of the individual corporations. *Real Estate Investors Four, Inc. v. Am. Design Group, Inc.*, 46 S.W.3d 51, 56 (Mo.App. E.D.2001). We do acknowledge that C.C. Mid West was very involved in setting up the lease, which certainly raises concerns about how unrelated the lease was to Mr. Nunn's work with C.C. Mid West. Since no evidence was presented showing any such domination or control of either company by the other, the Commission and our court must see them as separate entities. Therefore, this reason for questioning the lease is not valid.

■ The real question is whether or not the lease itself created an ownership interest for Mr. Nunn in the truck that he was leasing. The Act must be liberally construed in favor of a claimant, but not to the extent that the intent of the legislature is negated. *Thompson v. Mo. Veterans' Home*, 58 S.W.3d 657, 661 (Mo.App. S.D. 2001) (overruled on other grounds by *Hampton*, 121 S.W.3d at 223, 225). Section 287.020 does not define "owner." So we are left to decide what the legislature meant when it said that an owner-operator is not an employee. As both parties acknowledge, there is little case law dealing with this relatively new exception to workers' compensation law. C.C. Mid West focuses on determining the intent of the legislature by defining the word "owner," while Mr. Nunn focuses on the two cases that do decide whether or not a claimant is an owner-operator.

■ When construing a statute, our primary goal is to ascertain the intent of the legislature from the language used and to give effect to that intent by giving the words used their plain and ordinary meaning. *State ex rel. Nixon v. QuikTrip Corp.*, 133 S.W.3d 33, 37 (Mo. banc 2004). When a statute does not define a term, that term "will be given its plain meaning as derived from the dictionary." *State ex rel. Hope House, Inc. v. Merrigan*, 133 S.W.3d 44, 49 (Mo. banc 2004). In fact, the Missouri Supreme Court has gone to the dictionary to define terms contained in the Act in the past. *See Curry v. Ozarks Elec. Corp.*, 39 S.W.3d 494, 496–97 (Mo. banc 2001) (overruled on other grounds by *Hampton*, 121 S.W.3d at 223, 225).

■ The dictionary defines "own" as, among other things, "to have or hold as property or appurtenance: have a rightful title to, whether legal or natural: possess"; "owner" as "one that owns: one that has the legal or rightful title whether the possessor or not"; and "ownership" as, among other things, "the state, relation, or fact of being an owner." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1612 (1993). "Own" is also defined as "to have power over: control." MERRIAM-WEBSTER ONLINE DICTIONARY.[4] And Black's Law Dictionary defines "own" as "[t]o rightfully have or possess as property; to have legal title to"; "owner" as

---

4. This is available at *http://www.merriamwebster.com*. The reader must then enter "own" into the dictionary part of the webpage to be taken to the definition.

"[o]ne who has the right to possess, use, and convey something; a person in whom one or more interests are vested"; and "ownership" as "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others." BLACK's LAW DICTIONARY 1137–38 (8th ed.2004).

Based on these dictionary definitions and the language of the lease, Mr. Nunn did not own his truck. The lease states that unless Mr. Nunn exercises his right to purchase the truck, "at all times during the term of this Lease, no title to Tractor shall vest in Lessee." Although the lease certainly gives him power over the truck and a right to possession and use of it, if he does not exercise his option to purchase it, he does not have title in the truck, which is part of all of the definitions of "own" and "owner."

 C.C. Mid West claims that we can look to the definition of "owner" in other statutory provisions that deal with motor vehicles: Chapters 301, 302, and 303. "Owner" is defined as:

> [A]ny person, firm, corporation or association, who holds the legal title to a vehicle or in the event a vehicle is the subject of an agreement for the conditional sale or lease thereof with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, or in the event a mortgagor of a vehicle is entitled to possession, then such conditional vendee or lessee or mortgagor shall be deemed the owner for the purpose of this law.

§ 301.010(42).[5] This definition would certainly encompass the lease that Mr. Nunn had on his truck. As C.C. Mid West correctly points out, "[s]tatutes relating to the same subject matter are considered in pari materia." *KC Motorcycle Escorts, L.L.C. v. Easley,* 53 S.W.3d 184, 187 (Mo.App. W.D.2001). Such statutes are construed together even though they are found in different chapters or were enacted at different times. *Id.* And the legislature is presumed to be aware of the state of the law when it enacts a statute. *Thompson,* 58 S.W.3d at 661. But while all these statements of the law are true, the real question is whether or not these chapters are actually about the same subject matter. Chapters 301, 302, and 303 are dealing with motor vehicles. Chapter 287, on the other hand, is about workers' compensation. Although ownership of a motor vehicle is contained within Chapter 287, motor vehicles are not the subject matter of that chapter. So it is unclear whether the definition from section 301.010(42) should be applied, and, as such, we will defer that decision until after we consider the case law.

There are two cases that have considered the owner-operator exception under section 287.020.1, *Harp v. Malone Freight Lines, Inc.,* 16 S.W.3d 667 (Mo.App. E.D. 2000) (overruled on other grounds by *Hampton,* 121 S.W.3d at 223, 225), and *Owner Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.,* 133 S.W.3d 162 (Mo. App. S.D.2004).[6] In *Harp,* the driver and claimant, Mr. Carl Harp, drove a truck owned by his brother, Mr. Dan Harp, and leased to Malone. 16 S.W.3d at 669. After Carl Harp was injured while making a delivery for Malone, he filed a workers' compensation claim and the Commission

---

5. Sections 302.010(16) and 303.020(9) have similar definitions for owner.

6. *Booth* also deals with the owner-operator exception, but in *Booth* the claimant admitted that he was an owner-operator, 21 S.W.3d at 875, so that case is not applicable to our case.

found that he was an employee of Malone. *Id.* Malone claimed that section 287.020.1 exempted Carl Harp because it applied to operators of over-the-road trucks regardless of whether or not the driver owned the truck. *Id.* at 670. The eastern district held that the exemption applied only if the operator was an owner *and* operator of the truck. *Id.* Because Carl Harp did not own the truck—his brother did—he was not within the exception. *Id.*

Although *Harp* analyzes the meaning of the owner-operator exception, it is distinguishable from our case because Carl Harp clearly did not own the truck that he was driving and there was no lease similar to the one that Mr. Nunn signed. As the opinion makes clear, Dan Harp's ownership of the truck did not, in any way, make Carl Harp the owner of the truck. As such, *Harp* is not really helpful to either Mr. Nunn or C.C. Mid West.

*New Prime*,[7] on the other hand, is far more similar to our case. *New Prime* was a class action suit brought by truck drivers who had been charged and paid premiums for workers' compensation insurance by the company for which they drove. 133 S.W.3d at 166. The drivers had entered into lease agreements with Prime, a motor carrier that was primarily engaged in the enterprise of providing transportation services. *Id.* The drivers had trucks through lease-purchase agreements with Success Leasing, Inc. *Id.* The drivers alleged that Success was wholly owned by certain officers and directors of Prime, *id.*, but whether that is true is not entirely clear in the case and did not appear to influence the southern district's decision in any way. The main issue from *New Prime* that applies to our case is whether or not the drivers were owner-operators and, therefore, exempt from workers' compensation coverage. *See id.* at 171–73. The south-

ern district considered the *Harp* decision and its discussion of the meaning of the owner-operator exception. *Id.* at 172. Prime made the same argument that C.C. Mid West makes, that we should look to the definition of "owner" that exists in Chapters 301, 302, and 303. *Id.* The southern district rejected this argument, stating:

> Prime cites no authority directly supporting its theory that the workers' compensation law intended to use the above definition of "owner." [from sections 301.010(42), 302.010(16), and 303.020(9)] We do, however, have the following principles of the workers' compensation law that were stated previously in this opinion: that the fundamental purpose of the workers' compensation law is to lay the responsibility on industry for losses sustained by employees resulting from injuries arising out of or in the course of employment and that the workers' compensation law is to be construed so as to extend the benefits of the act to the largest possible class of people. These principles provide support for the argument that perhaps the non-adoption of the definition of "owner" from other chapters was intentional.

*Id.* at 173 (internal citations omitted). The court also acknowledged that the case was factually different from *Harp*, but stated that because the lease-purchase agreement specifically indicated that the lessee would not obtain any ownership interest in the vehicle during the period of the lease, the court would apply the statutory construction from *Harp*. *Id.* The court found that the drivers were not owner-operators. *Id.*

Aside from not knowing the exact language of the lease-purchase agreements between the drivers and Success in *New Prime*, that case appears to be identical to

7. In the *New Prime* opinion, New Prime is referred to as Prime.

our case. The drivers all have their own trucks, but they are through leases with the option to purchase and the drivers did not obtain ownership during the lease. There is some type of connection between the company that leases the trucks and the motor vehicle carrier company. And the transportation company argued that the definition of owner from Chapters 301, 302, and 303 should apply. So following *New Prime,* Mr. Nunn is not an owner-operator.

But C.C. Mid West asserts that *New Prime* was wrongly decided. It claims that no direct authority of the legislature's intent to adopt the definition from Chapter 301 is necessary because we must presume that the legislature knew the state of the law when it adopted the change in section 287.020.1. *Thompson,* 58 S.W.3d at 661. C.C. Mid West then claims that the statutes must be construed together.

C.C. Mid West also points out that our Supreme Court has said that "owner" is a word of rather broad meaning. *U.S. Fid. & Guar. Co. v. Safeco Ins. Co. of Am.,* 522 S.W.2d 809, 817 (Mo. banc 1975). The court also cited with approval an Eighth Circuit case involving Missouri law that said that the word "owner" when applied to motor vehicles includes " 'not only absolute estates but also includes estates less than absolute' " and that an owner " 'is one who has dominion over' " the vehicle. *Id.* at 817–18 (quoting *Powell v. Home Indem. Co.,* 343 F.2d 856, 859 (8th Cir.1965)). *See also, Huff v. Union Elec. Co.,* 598 S.W.2d 503, 512–13 (Mo.App. E.D.1980) (holding that a utility is an "owner" of a railroad

right-of-way for workers' compensation statutory employer purposes, based in part on its control over the land, its volt line on the right-of-way that, as a practical matter, would remain there for years to come, and the definition of "owner"). So C.C. Mid West maintains that the word "owner" includes Mr. Nunn because he has a lease-purchase agreement for his truck, which is less than an absolute estate but still gives him dominion over the truck.

After considering all of these arguments, we agree with the *New Prime* court and will apply its decision to this case. We do not believe that Chapters 301, 302, and 303 deal with the same subject matter as Chapter 287; the former are specific to motor vehicles and the latter is about workers' compensation. While it is true that we will sometimes use analogous statutes to construe new statutes, we do not believe that this situation warrants such an analogy. The southern district was correct in holding both that the non-adoption of the definition of "owner" from the other chapters was probably intentional and that these lease-purchase agreements do not create an ownership interest in the trucks. The Commission's finding that Mr. Nunn is not an owner-operator and not exempt from the Act under this exception is, therefore, supported by competent and substantial evidence on the whole record and so we affirm.[8]

**B. Independent Contractor or Employee**

■ C.C. Mid West next claims that even if Mr. Nunn was not an owner-opera-

---

8. The Commission's second reason for finding no ownership was the fact that the lessor can cancel with seven days' notice, negating the option-to-purchase provision. C.C. Mid West claims that the right to cancel is irrelevant to whether or not Mr. Nunn owned the truck. We were not directed to any law on this matter. Because we held that Mr. Nunn is not an owner-operator, based on the language of the lease, the definition of "owner," and *New Prime,* we do not consider the effect of the seven days' notice to cancel on the requirement that Mr. Nunn give thirty days' notice to purchase. As stated, the whole record otherwise supports the Commission's decision.

tor, he still is not entitled to coverage under the Act because he is an independent contractor and not an employee, and that the Commission erred as a matter of law in finding otherwise. As stated above, a finding that a claimant is or is not an employee is an application of law. *DiMaggio*, 19 S.W.3d at 188. But under section 287.495.1, we can reverse the resolution of this question of law only on one of four grounds; the relevant ground here being that there was not sufficient competent evidence in the record to support the Commission's decision.

 In deciding whether the claimant is an employee or an independent contractor, the facts of each case control. *Phillips v. Par Elec. Contractors*, 92 S.W.3d 278, 282 (Mo.App. W.D.2002) (overruled on other grounds by *Hampton*, 121 S.W.3d at 223, 225). The pivotal question is whether the employer had the right to control the means and manner of the service, instead of just controlling the ultimate results of the service. *DiMaggio*, 19 S.W.3d at 188. Missouri generally uses the right to control test to determine whether a claimant is an employee or an independent contractor. *Phillips*, 92 S.W.3d at 282. The court considers eight factors: "(1) the extent of control, (2) the actual exercise of control, (3) the duration of the employment, (4) the right to discharge, (5) the method of payment, (6) the degree to which the alleged employer furnished equipment, (7) the extent to which the work is the regular business of the employer, and (8) the employment contract." *Id.* Each of these factors is relevant to the determination, but no one factor is dispositive. *DiMaggio*, 19 S.W.3d at 189. Both parties discuss this eight factor test, and each believes that the factors weigh in its favor.

## 1. Extent of Control

In looking at how much control C.C. Mid West had over Mr. Nunn, we look to the Agreement to see what powers C.C. Mid West retained for itself. Mr. Nunn is not allowed to be involved in anything that would conflict with C.C. Mid West's interests, which seems reasonable because C.C. Mid West would not want someone who is providing it a service to be working against its interests. C.C. Mid West can also terminate the Agreement for any reason, which suggests a certain amount of control.

Mr. Nunn is responsible for providing his own vehicle and all fuel and maintenance costs, and there are no directions on how or where he should purchase these things. C.C. Mid West must inform Mr. Nunn where to pick-up and deliver his orders, but says nothing about how he must deliver them. Mr. Nunn has the sole right to hire and terminate his own employees, and C.C. Mid West has no right to control, direct, or supervise those employees except for the ultimate pick-up and delivery. It did, however, retain the right to complain about and have removed any driver who was not careful and competent. Both parties can cancel the Agreement with thirty days' notice, although during the first ninety days of the Agreement C.C. Mid West can cancel the Agreement without any notice. Mr. Nunn is required to record deliveries on a driver report. Although Mr. Nunn is not required to wear a uniform, C.C. Mid West provided him with the opportunity to do so and paid him a bonus if he did so.

This factor is not entirely clear. The Commission found that C.C. Mid West retained control over Mr. Nunn because of the following: it had the right to terminate him without notice for the first ninety days, he could not engage in any business that conflicted with C.C. Mid West's inter-

ests, he could not have his wife or child ride with him, he had to use C.C. Mid West forms, and he had to sign shipping documents "on behalf of the Company." There is sufficient competent evidence in the record to support these findings.

### 2. Actual Exercise of Control

In looking at how the parties actually conducted themselves, how much control C.C. Mid West actually exercised over Mr. Nunn is a closer question. Mr. Nunn claims that the route for each day was set out and his truck was loaded according to that route. Mr. Hilke, however, claimed that the drivers chose their routes and that their trucks were then loaded accordingly. Mr. Nunn was not required to call in during the day, but doing so was the only way to find out about more deliveries. Mr. Nunn believed that he was unable to haul for any other companies and could not decline any hauls, although Mr. Hilke stated that Mr. Nunn could both haul for other companies and decline hauls for C.C. Mid West.

We defer to the Commission on issues of credibility and for the resolution of conflicts in the evidence. *Seeley v. Anchor Fence Co.*, 96 S.W.3d 809, 815 (Mo.App. S.D.2002) (overruled on other grounds by *Hampton*, 121 S.W.3d at 223). The Commission resolved these conflicts in Mr. Nunn's favor, finding that he was required to call into the terminal after each delivery and was provided with the route that he was to take and that his truck was loaded according to that route. Because the evidence was conflicting, we defer to the Commission's resolution of that conflict and finding that C.C. Mid West exercised control over Mr. Nunn.

### 3. Duration of Employment

Mr. Nunn worked for C.C. Mid West from December of 2000 until he was termi-nated in May of 2002. So he was not hired for just one job, he worked for C.C. Mid West continually for approximately a year and a half.

### 4. Right to Discharge

Both parties had the right to cancel the contract, which appears to put them on equal footing. But C.C. Mid West could terminate for any reason, while nothing is said about whether Mr. Nunn must have a reason to terminate. And during the first ninety days of the contract, C.C. Mid West was not even required to give Mr. Nunn any notice before termination. Further, C.C. Mid West has actually exercised this right to terminate Mr. Nunn.

### 5. Method of Payment

Mr. Nunn was paid based on the mileage and weight of his hauls. At the end of the year he received a form 1099, not a W-2. And C.C. Mid West did not deduct any taxes from his pay, nor provide him with any benefits. Further, in 2000, the only year for which we have Mr. Nunn's tax information, Mr. Nunn did not claim his pay from C.C. Mid West as wages, he claimed it as income from his business. So payment definitely falls in favor of finding an independent contractor relationship, although we are not bound by the method used to report earnings. *Wilmeth v. TMI, Inc.*, 26 S.W.3d 476, 481 (Mo.App. S.D. 2000) (overruled on other grounds by *Hampton*, 121 S.W.3d at 223, 225).

### 6. Equipment

Mr. Nunn provided the majority of his equipment. C.C. Mid West provided only the trailers that were attached to the truck for the hauls and a cell phone so that Mr. Nunn could call in to find out about more deliveries. The Commission found that the provision of this equipment demonstrated C.C. Mid West's exercise of control

over Mr. Nunn, although it made no findings about the fact that Mr. Nunn provided the rest of his equipment.

### 7. Mr. Nunn's Work and the Regular Business of C.C. Mid West

C.C. Mid West is in the business of providing transportation services to various clients. Mr. Nunn drives a truck transporting goods to those clients. C.C. Mid West could not provide the transportation services without truck drivers, so Mr. Nunn's work was within its regular business.

### 8. The Employment Contract

The Agreement makes it very clear that Mr. Nunn is an independent contractor. That fact is in the title of the Agreement as well as the first section. The fact that Mr. Nunn chose not to read the Agreement and believed that it was an employment contract does not negate the fact that it is actually an independent contractor contract. A person signing an agreement has a duty to read it and, absent a showing of fraud, if the person is capable of reading and understanding the contract then he is charged with the knowledge of what the contract says. *Farmland Indus., Inc. v. Bittner*, 920 S.W.2d 581, 584 (Mo.App. W.D.1996). He cannot avoid the consequences of what he signed by simply saying that he did not know what he signed. *Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 79 (Mo. App. S.D.2003). Mr. Nunn is, therefore, held responsible for signing a contract that states that he is an independent contractor. But " 'while the contractual designation of the work status of a person is not to be brushed aside or ignored, it is not conclusive when there is evidence to overcome such designation.' " *Gaston v. J.H. Ware Trucking, Inc.*, 849 S.W.2d 70, 75 (Mo.App. W.D.1993) (internal citation omitted) (over-

ruled on other grounds by *Hampton*, 121 S.W.3d at 223, 225).

All of these factors are relevant, but we cannot focus on one to the exclusion of the others. *DiMaggio*, 19 S.W.3d at 189. Three of the factors support finding that Mr. Nunn is an independent contractor: factors 5 (method of payment), 6 (equipment), and 8 (employment contract). Three factors support finding that he is an employee: 3 (duration of employment), 4 (right to discharge), and 7 (regular business of C.C. Mid West). We defer to the Commission on the resolution of evidence, *Seeley*, 96 S.W.3d at 815, so factor 2 (actual control) also supports finding that he is an employee. Factor 1 (extent of control) is less clear, but the Commission found that that factor supported finding that Mr. Nunn was an employee and there was substantial and competent evidence to support that decision. So under our standard of review we must accept that factual finding. There are, therefore, five factors in favor of finding an employment relationship and only three factors in favor of finding an independent contractor relationship. This other evidence overcame the contractual designation of independent contractor. So Mr. Nunn was an employee, not an independent contractor.

Further, Missouri has a longstanding principle that workers' compensation " 'law is to be broadly and liberally interpreted ... and is intended to extend its benefits to the largest possible class ... Any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee.' " *Phillips*, 92 S.W.3d at 284 (quoting *West v. Posten Constr. Co.*, 804 S.W.2d 743, 746 (Mo. banc 1991)). Workers' compensation law's purpose is to put employees' losses due to injury during employment onto the industry because it can better afford these losses. *Gaston*, 849 S.W.2d at 74, 76.

This purpose also supports finding that Mr. Nunn was an employee; C.C. Mid West could pass this cost onto customers while Mr. Nunn could not because C.C. Mid West set his income.[9]

### IV. Conclusion

Under our standard of review, the Commission's decision must be upheld if it is supported by competent and substantial evidence on the whole record. *DiMaggio,* 19 S.W.3d at 188. The Commission's finding that Mr. Nunn is not an owner-operator is supported by competent and substantial evidence on the whole record. And while the Commission's finding that Mr. Nunn was an employee is a question of law, we defer to the Commission's finding of the facts that determine whether or not he is an employee and those facts are supported by competent and substantial evidence on the whole record. This is not one of those rare cases where the award is contrary to the overwhelming weight of the evidence. Therefore, we affirm the Commission's decision.[10]

LISA WHITE HARDWICK, P.J., and ROBERT G. ULRICH, J. concur.

---

9. Because we affirm the Commission's finding that Mr. Nunn was C.C. Mid West's employee, we do not consider whether C.C. Mid West was his statutory employer.

10. Mr. Nunn requested, in his conclusion, that we allow him attorney fees. But litigants must bear their own attorney's fees unless otherwise provided for by contract or statute. *Gebru v. St. Louis County,* 136 S.W.3d 89, 93 (Mo.App. E.D.2004). Mr. Nunn has not pled any basis for receiving these fees, so we deny his request.