Timothy C. **RADER**, Respondent,

v.

**WERNER ENTERPRISES, INC.**, and **St. Paul Travelers Insurance Company**, Appellants,

and

**Treasurer of Missouri as Custodian of Second Injury Fund**, Respondent.

No. ED 95905.

Missouri Court of Appeals,
Eastern District,
Division Five.

Jan. 10, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 23, 2012.

Mary Anne Lindsey, St. Louis, MO, for appellant.

Stephen W. Thurmer, (Timothy C. Rader), St. Louis, MO, Carol L. Barnard, (Second Injury Fund), St. Louis, MO, for respondents.

PATRICIA L. COHEN, Judge.

### Introduction

Werner Enterprises (Employer) appeals the final order of the Labor and Industrial Relations Commission (Commission) granting Timothy Rader (Claimant) week-

ly permanent total disability benefits and future medical costs as a result of the injury he sustained working for Employer on May 29, 2003. Employer claims the Commission erred in finding that: (1) the Commission had jurisdiction over Claimant's claim; (2) Claimant was an employee and not an owner-operator; (3) Claimant sustained a significant back injury on May 29, 2003; (4) Claimant was entitled to future medical care for his back condition; (5) Claimant was permanently and totally disabled solely as the result of the May 29, 2003 injury; and (6) Claimant's average weekly wage was $1,312.32. We affirm.

### Factual and Procedural Background

Claimant, a resident of Texas, worked as a truck driver and trainer for Employer, a transportation and logistics company headquartered in Omaha, Nebraska. Prior to his employment with Employer, Claimant served in the U.S. Army from 1977 until 1986, during which time he sustained injuries to his knees and back. Claimant did not receive treatment for his knees or back from 1986 until his work-related injury in May 2003.

Claimant worked for Employer for approximately four years in the mid–1990s and returned to Employer's employ in August 2000. In February 2003, Claimant purchased a truck through a subsidiary of Employer, and Employer changed his job classification to owner-operator. On February 5, 2003, Claimant executed an "Owner–Operator Workers' Compensation Coverage Agreement" (Owner–Operator Coverage Agreement), which provided:

> The Contractor hereby acknowledges that states (other than the State of Nebraska) in which the Contractor may or may not claim a residence, may have Workers' Compensation benefits that are substantially different from those offered in the State of Nebraska. How-

ever, the Contractor does waive jurisdiction of any said Workers' Compensation State (other than Nebraska) and does hereby fully and knowingly consent to the State of Nebraska's Workers' Compensation Laws.

On May 29, 2003, Claimant was unloading a truck at an Anheuser–Busch distribution center in the City of St. Louis when a partially empty beer keg rolled out of the truck and struck Claimant's head, knocking him to the ground. Claimant was unsure whether he lost consciousness. An ambulance transported Claimant to the emergency room at St. Louis University Hospital, where Claimant complained of pain in his head, neck, back, buttocks, and legs, as well as penile numbness. Doctors discharged Claimant the same day with directions to follow-up with either his primary care or workers' compensation physician.

During Claimant's 900–mile return drive to Texas, he suffered severe pain and an episode of fecal incontinence. On June 3, 2003, Claimant sought treatment at East Texas Medical Center in Athens, Texas for pain in his lower back and right leg and numbness in his left leg. Doctors performed an MRI, which revealed a large central herniation at L4–5 disc and a bulging disc. Based on the MRI results, doctors transferred Claimant by ambulance to a regional medical center in Tyler, Texas, where Claimant was seen by Dr. Hackbarth. Dr. Hackbarth ordered a myelogram and epidural steroid injections and prescribed pain medications. Claimant's diagnosis was lumbar disc protrusion and right lumbar radiculitis. The hospital discharged Claimant on June 6, 2003.

On June 16, 2003, Claimant returned to Dr. Hackbarth with complaints of back pain, back weakness, and numbness in his left leg and penis. On July 3, 2003, Dr. Hackbarth performed bilateral L2, L3, L4

and L5 medial branch neurotomies with radiofrequency. Claimant reported that the procedure relieved his pain for a day and a half.

On August 11, 2003, Dr. Hackbarth performed L3–4, L4–5, and L5–S1 discographies and concluded that Claimant had an L4–5 disc with partially concordant pain response, with slightly equivocal results. Claimant continued treatment with various pain medications and physical therapy. Claimant began seeing Dr. Lloyd for pain management in October 2003.

Eventually, Claimant was referred to Dr. Esses for treatment of back pain. On November 24, 2003, Dr. Esses performed discectomies at L4–5 and L5–S1. On May 19, 2004, Dr. Esses performed hemilaminotomy, decompression, and discectomy at L4–5. Claimant reported that this procedure relieved the pain in his back and legs until August 2004, when the pain suddenly recurred without either specific incident or trauma.

On January 21, 2005, Claimant underwent a laminectomy and decompression with lumbar fusion at L4–5 and L5–S1. In March 2005, Claimant began seeing Dr. Lloyd almost monthly for management of medication for his lumbar pain. Due to Claimant's continuing high level of pain, Dr. Lloyd inserted a dual-lead spinal cord stimulator on February 2, 2006. Dr. Lloyd later removed the spinal cord stimulator because it did not relieve Claimant's symptoms.

Claimant filed a claim for workers' compensation benefits on May 25, 2005. On June 20, 2005, Employer filed its first answer to Claimant's claim for compensation on a Form 22, which instructs the answering party to "describe below each statement or allegation in the claim for compensation that is being disputed, the reason why it is being disputed and the facts in regard thereto . . . ." and "list all affirmative defenses." In its answer, Employer declared: "Employer and Insurer dispute Missouri jurisdiction based on an 'employee employment agreement', between employee and employer that Nebraska Law shall govern as to both interpretation and performance."

The Administrative Law Judge (ALJ) for the Division of Workers' Compensation held a hearing on December 2 and 17, 2009. Prior to the hearing, the ALJ asked Claimant's counsel to state the issues in the case. Claimant's counsel asserted that one issue, among others, was "whether Missouri or Nebraska law applies in this matter." Counsel for Employer agreed with Claimant's framing of the issues. In his opening statement at the Division hearing, counsel for the Employer argued in support of its contention that the Commission lacked jurisdiction, as follows:

> This man, by his log, was in Missouri one or two times in the 13 two week [sic] prior to his injury, and therefore, does not in our opinion, have facts that would allow it to be said that his principle place of employment within 13 weeks before May 29, 03, was in the State of Missouri. The only nexus possibly to Missouri jurisdiction is accident only.

Employer's counsel continued, contending that Nebraska and not Missouri law should apply because: "he took his DOT physical in Nebraska. He agreed to be bound by the laws of the State of Nebraska to the exclusion of the laws of any other state. So, that we feel that Missouri has no jurisdiction here, and the matter should go back to Nebraska. . . ."

During the hearing, Claimant testified that he had not worked since his injury on May 29, 2003. Claimant acknowledged that he sustained back and knee injuries while he was in the Army, but stated that these injuries never impeded his ability to

work. Claimant testified that, as a result of the May 2003 injury, he continued to suffer extreme pain in his back and legs, his daily activities were severely limited, and he had not worked since the accident. Claimant spent most of his time laying in bed or sitting in a massage chair. He was taking numerous pain medications and continued to see Dr. Lloyd for pain management.

Employer introduced into evidence the Owner–Operator Coverage Agreement signed by Claimant, and Claimant testified that he "knew [he] would be covered under the Nebraska Workers' Compensation law, and not the laws of any other state." Employer also presented the deposition testimony of Daniel Fridrich, senior counsel of workers' compensation for Werner Management, Inc. Mr. Fridrich reviewed the Owner–Operator Program, which included the Owner–Operator Coverage Agreement, and described it as "a document evidencing that [Claimant] has elected to bring himself within the coverage of the Nebraska Workers' Compensation Act."

Claimant and Employer presented the deposition testimony of numerous experts. At Claimant's request, Dr. Volarich examined Claimant on August 28, 2008. Dr. Volarich concluded that the May 2003 accident was the substantial contributing and prevailing factor in causing Claimant's current lumbar syndrome secondary to disc herniations at L4–5 and L5–S1, persistent lumbar radicular syndrome, and failed back syndrome. Dr. Volarich based his conclusions on the medical history provided to him by Claimant, which did not include Claimant's Army and VA records, or any other reference to the back injury Claimant suffered in the 1980s. Dr. Volarich later reviewed Claimant's Army and VA records and concluded that the lumbosacral strain Claimant suffered in the Army and Claimant's preexisting degener-ative disc disease and spondylosis did not alter his opinion that the May 2003 injury caused Claimant's disability.

At the request of Employer, Dr. Irvine examined Claimant on August 27, 2008. Dr. Irvine expressed the opinion that, prior to May 29, 2003, Claimant had pre-existing, chronic conditions in both knees and stenosis, spondylosis, and degenerative disc disease in his lumbar spine. According to Dr. Irvine, the May 2003 injury caused a mere lumbar strain, and Claimant's surgeries and ongoing back problems were not related to the May 2003 injury. Dr. Irvine believed Claimant's disability was caused by the surgical procedures. Dr. Irvine rated Claimant's permanent partial disability at 15% and believed Claimant was employable at the sedentary level.

Dr. deGrange reviewed Claimant's medical records and diagnostic studies at Employer's request. Dr. deGrange concluded that, as a result of the May 2003 injury, Claimant sustained a lumbar strain and a 5% permanent partial disability. Dr. deGrange stated that the MRI, myelogram, and CT scan of June 3 and June 4, 2003 indicated spinal stenosis, a degenerative, age-related disc disease that predated the May 2003 injury. Dr. deGrange believed the extensive medical care that Claimant received after the May 2003 injury was neither medically reasonable nor necessary and was unrelated to the May 2003 injury. Dr. deGrange concluded that Claimant could work in a light-medium capacity.

James England, a rehabilitation counselor retained by Claimant, evaluated Claimant on February 5, 2009. Mr. England concluded that, based on Claimant's subjective complaints, presentation, and restrictions, Claimant would not be able to successfully compete for employment. Donna Abram, a vocational rehabilitation consultant retained by Employer, evaluated Claimant on February 6, 2009, and

concluded that Claimant was employable in the sedentary to light capacity.

In its award, the ALJ concluded that the Division had jurisdiction over Claimant's claim; Claimant was Employer's employee at the time of the May 2003 injury; Claimant was permanently and totally disabled as a result of the May 2003 injury; Claimant was entitled to future medical care and temporary total disability; and Claimant earned an average weekly wage of $1,312.32, resulting in a rate of $649.32 per week for TTD/PTD and $340.12 for PPD. The ALJ concluded the Second Injury Fund was not liable to Claimant, and it ordered Employer to pay Claimant permanent total disability benefits and future medical care.

Employer filed a 40–paragraph Application for Review with the Commission. With respect to the Commission's jurisdiction, the Application provided as follows:

> (6) The accident alone occurring in the State of Missouri does not confer jurisdiction of the Missouri Workers' Compensation law because claimant was never an employee under Missouri law and Section 287.110.2. RSMo. does not apply to a non-employee (here owner/operator) injured in this State.
>
> (7) Even though the accident as such occurred in Missouri, Section 287.110.2 RSMo. does not apply on any possible grounds because there was no contract of employment in the State of Missouri and the claimant's alleged employment was not principally located in this State, his accident occurring on a single, incidental trip to Missouri.
>
> (23) The contractual language of the owner/operator agreement which claim-

ant and Werner signed specifically provides that the parties agreed to be exclusively bound by the laws of the State of Nebraska to the exclusion of the laws of any other state.

On October 29, 1010, the Commission affirmed and adopted the ALJ's decision by way of a supplemental opinion. In its opinion, the Commission thoroughly addressed the issue raised in paragraph 6 of the Application for Review and determined that Claimant was not an owner/operator and, further, was an employee and not an independent contractor. With respect to paragraph 7 and paragraph 23 above, the Commission did not specifically address those contentions in its supplemental opinion. However, the Commission noted that it "otherwise agree[d] with the analysis, findings, and conclusions of the administrative law judge...." Employer appeals.

### Standard of Review

■ Upon review of the Commission's final award, this court may modify, reverse, remand for rehearing, or set aside the award only if the Commission acted without or in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant the making of the award. Mo.Rev.Stat. § 287.495.[1] We examine the whole record to determine whether it contains sufficient competent and substantial evidence to support the award, and only in the rare case will we find an award to be against the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003).[2] We defer to the Commission on issues of fact,

---

1. References to statutes are to RSMo 2000.

2. We note that several cases overruled by *Hampton*, to the extent they are in conflict with the holding therein, are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Hampton*, 121 S.W.3d at 224–32.

but we review *de novo* questions of law, including issues of statutory interpretation. *Endicott v. Display Techs., Inc.*, 77 S.W.3d 612, 615 (Mo. banc 2002); *Herschel v. Nixon*, 332 S.W.3d 129, 133 (Mo.App. W.D. 2010).

We note that both Claimant and Employer appear to agree that, based on the date of Claimant's injury, his claim is governed by the Workers' Compensation Law as it existed prior to the 2005 amendments to the Law. Under the pre–2005 statute, "[a]ny doubt as to the right of an employee to compensation should be resolved in favor of the injured employee." *Angus v. Second Injury Fund*, 328 S.W.3d 294, 297–98 (Mo.App. W.D.2010), *quoting Schoemehl v. Treasurer*, 217 S.W.3d 900, 901 (Mo. banc 2007).

### Discussion

#### 1. Jurisdiction

■■■■■ Employer contends in point one that the Commission did not possess jurisdiction because, by virtue of the Owner–Operator Coverage Agreement, Claimant: (1) agreed to be bound solely by Nebraska's workers' compensation law; and (2) waived jurisdiction of the workers' compensation laws of any other state.[3] Claimant counters that the Commission properly exercised jurisdiction over his claim because he was injured in Missouri and the "consent to State of Nebraska Worker's Compensation" was executed outside of Missouri and was a mandatory condition of "work for Werner." In analyzing jurisdictional issues, we are guided by the proposition that "where a question of jurisdiction is in doubt, it should be determined in favor of the Commission." *Stufflebean v. Crete Carrier Corp.*, 895 S.W.2d 115, 116 (Mo.App. W.D.1995).

In support of its argument, Employer relies primarily on *Pepsi Midamerica v. Harris*, 232 S.W.3d 648 (Mo.App. S.D. 2007). We do not consider *Pepsi Midamerica* persuasive. Although we agree with the general principles outlined in *Pepsi Midamerica* regarding a court's duty to ascertain the intent of parties to a contract and give effect to that intent, *Pepsi Midamerica* does not concern workers' compensation law, let alone the significance of choice of law language where, as here, a worker is injured on the job in Missouri and is thereby covered by express language in Section 287.110.2.[4]

---

**3.** In the body of its argument (although not in its point on appeal), Employer also argues that a clause of Section 287.110.2, "unless the contract of employment in any case shall otherwise provide", operates to divest the Commission of jurisdiction. Employer did not raise this question of statutory interpretation before the Commission, instead focusing solely on its argument that Claimant was an owner-operator/independent contractor who had contractually agreed to be bound by Nebraska law. Because Employer expands its allegation of error beyond the Application for Review, we decline to consider it here. *See Smith v. Richardson Bros. Roofing*, 32 S.W.3d 568, 573 (Mo.App. S.D.2000). We note, however, that the most recent construction of Section 287.110.2 in *Stufflebean v. Crete Carrier Corp.*, 895 S.W.2d 115, 117 (Mo.App. W.D. 1995) confines the clause in question to out-

of-state injuries. Moreover, in the case that Employer relies on, *State ex rel. Weaver v. Mo. Workmen's Compensation Comm'n*, the agreement at issue very clearly was a contract of employment and the employer did not dispute the employer-employee relationship. 339 Mo. 150, 95 S.W.2d 641, 641–42 (1936). By contrast, in this case, Employer argued both at the Commission level and here that the relevant agreement did not create an employer-employee relationship but rather established an independent contractor relationship.

**4.** Section 287.110.2 provides: "This chapter shall apply to all injuries received and occupational diseases contracted in this state, regardless of where the contract of employment was made, and also to all injuries received and occupational diseases contracted outside of this state under contract of employment

Claimant focuses on two cases that analyze choice of law issues in the context of workers' compensation claims: *Miller v. Hirschbach Motor Lines, Inc.,* 714 S.W.2d 652 (Mo.App. S.D.1986) and *Swallow v. Enterprise Truck Lines, Inc.,* 894 S.W.2d 232 (Mo.App. E.D.1995). These cases appear to be the only Missouri cases addressing the significance of the type of choice of law language contained in the Owner–Operator Coverage Agreement.

In *Miller,* the claimant's spouse entered into an operating agreement with the employer that contained a provision providing that the laws of the State of Nebraska governed the agreement's interpretation and performance. 714 S.W.2d at 655. Based on the choice of law language in the agreement, the employer contended that the law of Nebraska, rather than the law of Missouri, should govern the claimant's claim for workers' compensation. *Id.* In analyzing the validity of the choice of law language, the following principles guided the court:

> It is understandable that at the inception of their contract the parties, particularly the employer, may wish to fix the governing law conclusively so that they can know what their rights or duties are, and so that compensation liability insurance can be taken out under the controlling state's system. To this end a clause is sometimes included in employment contracts specifying what law is to govern. *Such a provision has been said to be valid, but most states give it little or no effect.* Since compensation cases involve interests considerably beyond the desires of the immediate parties, the tendency is to hold that the rules for choice of law imposed by the state supersede the parties' stated intent, espe-

cially if the intent clause appears in a form contract prepared by the employer and merely acceded to by the other party. R. Lefar, American Conflicts Law Section 160, p. 330 (3d ed.1977).

*Id.* at 655. (emphasis added). The court also relied on the Restatement (Second) of Conflict of Laws, Section 181, noting that "[g]enerally, an agreement by the parties to have a particular state's law apply will not deprive another state's court of the power to apply the law of the forum if such application is required either by the terms of the statute or by its underlying policy." *Id.* (internal quotation omitted). Quoting the language of Section 287.110.2 that "[t]his chapter shall apply to all injuries received ... in this state, regardless of where the contract of employment was made ....", the court held that because claimant "was a Missouri resident and the injury was sustained in Missouri," application of Missouri law was appropriate. *Id.* at 656.

In *Swallow,* the employer contended that the Commission erred in exercising jurisdiction because an employment agreement specified that Indiana law should apply as to "interpretation and performance." 894 S.W.2d at 233. The court, relying on *Miller v. Hirschbach,* held that "under some circumstances a choice of law provision may be disregarded." *Id.* Significant to the court's analysis was the determination that the injury occurred in Missouri. *Id.* The court also concluded that the record revealed no contact with Indiana other than its mention in the agreement. *Id.* Most importantly, the court found critical the Commission's finding that the parties intended to create a relationship of carrier and independent contractor and not an employ-

made in this state, unless the contract of employment in any case shall otherwise provide, and also to all injuries received and

occupational diseases contracted outside of this state where the employee's employment was principally localized in this state."

er-employee relationship: "[t]he parties intend to create by this Agreement the relationship of carrier and independent contractor and not an employer-employee relationship." *Id.* Thus, the choice of law language contained in the contract applied to an independent contractor relationship, not an employer-employee relationship, "which is the foundation of a worker's compensation claim." *Id.* Because the court held that the agreement in question intended the creation of an independent contractor relationship, rather than an employer-employee relationship, and "Section 287.110.2 specifically mandates that an employment contract is necessary in order to effectively specify which forum should have jurisdiction," the court concluded that the Commission properly exercised jurisdiction. *Id.*

■ This case is similar to *Swallow* in several important respects. First, as in *Swallow,* Employer sought to create an independent contractor relationship by virtue of the Owner–Operator Coverage Agreement. Therefore, the choice of law language contained in the Owner–Operator Coverage Agreement was intended to apply to an independent contractor relationship. Second, Claimant was injured in Missouri. Finally, Claimant had no relationship to Nebraska, Claimant was a resident of Texas, and the agreement purporting to convert Claimant from an employee to an owner-operator/independent contractor was executed in Colorado. Because the purported agreement between the parties did not intend to create an employer-employee relationship, the agreement was not sufficient to divest the Commission of jurisdiction, where, as here, the statute would otherwise support the Commission's jurisdiction.

We agree with Employer that the language at issue in the Owner–Operator Coverage Agreement more specifically focuses on a choice of Nebraska law for purposes of workers' compensation claims than the agreements in *Swallow* or *Miller.*[5] However, there is very little difference in the employers' contentions regarding the effect of the choice of law language at issue. In addition, although Employer seeks to distinguish *Miller,* it does not challenge a central conclusion of *Swallow,* that an independent contractor agreement is inadequate to specify a forum for purposes of Section 287.110.2. Moreover, when Employer argues that Claimant "submitted himself exclusively to the jurisdiction of Nebraska for any claim arising out of services performed under the Operating Agreement," it ignores the significance of the Commission's finding (discussed below) that, the services Claimant performed were performed as an employee and not an owner-operator pursuant to the Operating Agreement. Given our mandate that we resolve doubts with respect to jurisdiction in favor of the Commission, we deny point one.

## 2. Owner–Operator Exemption

In its second point on appeal, Employer claims the Commission erred in finding Claimant was an employee when he was injured on May 29, 2003. Employer contends that Claimant owned the tractor[6] he

5. Nevertheless, we also note that in its answer to Claimant's claim for compensation, the Employer stated that it disputed Missouri jurisdiction based on an agreement "between employer and employee that Nebraska Law shall govern as to both interpretation and performance." This is, in fact, nearly identi- cal to the language at issue in both *Miller* and *Swallow.*

6. The words "tractor" and "truck" are used interchangeably to describe the vehicle driven by a truck driver. *See Parsons v. Steelman Transp., Inc.,* 335 S.W.3d 6, 10 n. 3 (Mo.App. S.D.2011).

drove for Employer and was therefore an owner-operator under Section 287.020.1 and exempt from Missouri Workers' Compensation Law.

■ Section 287.020.1 defines an employee as a person in the service of any employer under any contract of hire, express or implied, oral or written. Mo.Rev. Stat. § 287.020.1; *Chouteau v. Netco Const.*, 132 S.W.3d 328, 332 (Mo.App. W.D. 2004). The statute specifically excludes from the definition of employee:

an individual who is the owner and operator of a motor vehicle which is leased or contracted with a driver to a for-hire common or contract motor vehicle carrier operating within a commercial zone as defined in section 390.020 or 390.041, RSMo, or operating under a certificate issued by the motor carrier and railroad safety division of the department of economic development or by the interstate commerce commission.

Mo.Rev.Stat. § 287.020.1. Whether a claimant is an employee for purposes of workers' compensation is a question of law, not a finding of fact, and is subject to correction by an appellate court. *Chouteau*, 132 S.W.3d at 332. Because we are applying the pre–2005 Workers' Compensation law, we construe the statute liberally "with a view to the public welfare." Mo.Rev.Stat. § 287.800.

■ A truck driver who does not have legal title to the truck he drives is not an owner and operator under Section 287.020.1. *Nunn v. C.C. Midwest*, 151 S.W.3d 388, 397 (Mo.App. W.D.2004).[7] In *Nunn*, the Missouri Court of Appeals used

dictionary definitions to construe the word "owner" as used in Section 287.020.1:

The dictionary defines "own" as, among other things, "to have or hold as property or appurtenance: have a rightful title to, whether legal or natural: possess"; "owner" as "one that owns: one that has the legal or rightful title whether the possessor or not"; and "ownership" as, among other things, "the state, relation, or fact of being an owner." Webster's Third New International Dictionary of the English Language 1612 (1993). "Own" is also defined as "to have power over: control." Merriam–Webster Online Dictionary. And Black's Law Dictionary defines "own" as "[t]o rightfully have or possess as property; to have legal title to"; "owner" as "[o]ne who has the right to possess, use, and convey something; a person in whom one or more interests are vested"; and "ownership" as "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others." Black's Law Dictionary 1137–38 (8th ed.2004).

151 S.W.3d 388, 396–97 (Mo.App.W.D. 2004). The *Nunn* court held that use, possession, and control of a vehicle are not sufficient to confer ownership. *Id.* at 397. To be deemed an owner, the driver must "have title in the truck, which is part of all of the definitions of 'own' and 'owner.'" *Id.*

■ Here, as in *Nunn*, the determinative issue is whether Claimant owned the truck he drove for Employer. To resolve this issue, the Commission first considered

7. In 2005, the Missouri General Assembly expressly rejected and abrogated the definition of "owner" propounded by the *Nunn* court. Mo.Rev.Stat. §§ 287.020.1; 287.043. These amendments, however, are not retroactive and, thus, do not apply to the instant case. *See e.g., Taylor v. Ballard R–II School Dist.*, 274 S.W.3d 629, 632–33 (Mo.App. W.D.2009) (holding that Section 287.230, expressly abrogating *Schoemehl v. Treasurer*, 217 S.W.3d 900 (Mo. banc 2007), did not apply to claims initiated before the effective date of the amendment).

whether legal title passed to Claimant and found that, while there appeared to be "an attempted conveyance of a Nebraska title for the tractor to [C]laimant, ... we find the evidence inconclusive as to whether this was accomplished." The record contains an application for title and a certificate of title, but the certificate of title is incomplete because it was not signed by Claimant and does not reflect the date of sale or the odometer reading. Furthermore, Claimant testified that he never received title to the tractor.

Because it was unclear whether Claimant had title to the tractor, the Commission examined the "bundle of rights" that Claimant enjoyed by virtue of signing the equipment finance agreement. The Commission first considered Claimant's right to use and possession of the tractor and found that Claimant's use of the tractor was restricted to the business he performed for Employer. The financial information disclosure addendum provides: "... Debtor will utilize said vehicle for the sole purpose of performing any and all duties necessary to fulfill the terms of his/her Contractor Agreement with Company Sponsor. Any use of the vehicle for personal or other business purposes will be deemed and [sic] event of default by Secured Party." Further, Claimant's rights in the truck were conditioned on his continued employment by Employer: "Termination of Independent Contractor's employment with Company Sponsor for any reason whatsoever shall be deemed a material adverse change in Independent Contractor's business and an additional event

of default under its Agreement with Secured Party."

■ The Commission then examined Claimant's right to convey the tractor and found this right similarly limited. In capitalized and underlined print, the equipment finance agreement states: *"YOU HAVE NO RIGHT TO SELL, TRANSFER, ASSIGN, LEASE OR ENCUMBER THE COLLATERAL OR THIS AGREEMENT."* One of the most vital elements of title and ownership is the right to transfer and convey the property unimpaired to another. *See Freeland v. Burdick,* 200 Mo.App. 226, 204 S.W. 1123, 1123 (1918). Competent and substantial evidence on the whole record supports the Commission's finding that Claimant did not own the truck because he had no right of conveyance and his use of the vehicle was conditioned upon his continued employment by Employer.[8] Point denied.

### 3. Causation

In its third point on appeal, Employer claims the Commission's award must be reversed because its finding that Claimant sustained a significant back injury on May 29, 2003 is contrary to the overwhelming weight of the competent and substantial evidence. Specifically, Employer contends the overwhelming weight of the evidence shows that Claimant merely sustained a lumbar strain, the accident did not aggravate Claimant's spinal stenosis, and Claimant's back condition was a preexisting and degenerative condition. Employer further argues that Dr. Volarich's testimony did not constitute competent and substantial

---

8. Employer argues that "any defect in the certificate of title or conveyance of the same to Claimant did not preclude Claimant from becoming owner of the tractor for purposes of Section 287.020.1" because, under Nebraska law, certificate of title is merely *prima facie* evidence, and not conclusive proof, of ownership. However, the Commission did not base its decision solely on the issue of title, but rather considered the "bundle of rights" attendant to ownership. We further note that Employer did not present this argument to the Commission. Issues not raised before the Commission are not preserved for review. *Garas v. Kelly Servs., Inc.,* 211 S.W.3d 149, 152 n. 1 (Mo.App. E.D.2007).

evidence because it was rendered in the absence of Claimant's complete medical history.

■■■■■ To be entitled to workers' compensation benefits, the claimant has the burden of proving that a work-related accident caused his or her injury. *Spencer v. Sac Osage Elec. Co-op., Inc.*, 302 S.W.3d 792, 800 (Mo.App. W.D.2010). Aggravation of a preexisting condition is a compensable injury if the claimant establishes a direct causal link between the job duties and the aggravated condition. *Johnson v. Indiana W. Express, Inc.*, 281 S.W.3d 885, 891 (Mo.App. S.D.2009), *citing Rono v. Famous Barr*, 91 S.W.3d 688, 691 (Mo. App. E.D.2002). Thus, an employer is liable where a work injury aggravates a preexisting, non-disabling condition and the condition escalates the level of disability. *Portwood v. Treasurer*, 219 S.W.3d 289, 293–94 (Mo.App. W.D.2007).

■■■■■ As previously stated, this court defers to the Commission on issues of fact, including issues involving credibility of witnesses and the weight to be given to their testimony. *Lacy v. Fed. Mogul*, 278 S.W.3d 691, 699 (Mo.App. S.D.2009). Conflicting medical theories present a credibility determination for the Commission. *Id.* "When causation depends on the acceptance or rejection of conflicting medical opinions or theories, it is up to the Commission and not the reviewing court to decide which of the two lines of expert reasoning was more credible." *Dubose v. City of St. Louis*, 210 S.W.3d 391, 397 (Mo.App. E.D.2006). Furthermore, we are mindful that any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee. *Clark v. FAG Bearings Corp.*, 134 S.W.3d 730, 738 (Mo.App. S.D.2004).

■■■■ Employer bases its argument on the medical records, diagnostic studies, VA and Army records, and the testimony of Employer's experts, Drs. Irvine and de-Grange, which suggest that Claimant merely suffered a lumbar strain that did not aggravate Claimant's spinal stenosis and Claimant's back condition was preexisting and degenerative in nature. The record reveals, however, that Claimant's expert, Dr. Volarich, expressed the opinion that the May 29, 2003 accident caused Claimant disc herniations at L4–L5 and L5–S1, requiring multiple surgical repairs. After reviewing Claimant's Army and VA records, Dr. Volarich noted that Claimant was asymptomatic and did not receive any treatment for his back from the time of his 1986–discharge until the May 2003 accident. Dr. Volarich concluded that any disability in Claimant's lower back resulting from the Army injury "is too small to quantify since [Claimant] had no hindrance in his ability to work leading up to 5/29/03." Dr. Volarich also found that, as a result of the work accident, Claimant continued to suffer various back problems.[9]

─────────

9. At his deposition, Dr. Volarich stated:

It was my opinion the work accident that occurred on May 29, 2003 when [Claimant] had a load of beer kegs and as he opened the back door of his trailer multiple kegs of beer fell out—these are empty kegs, fell out striking him on the upper torso and knocking him down to the ground and also caused a transient loss of consciousness is the substantial contributing factor, as well as prevailing or primary factor causing the closed head trauma with scalp hematoma and post-trau-matic headaches, as well as causing the cervical strain injury that resolved, as well as causing the thoracic strain injury that resolved, as well as causing the lumbar syndrome that included disc herniations at L4–5 and L5–S1 that required two separate surgical repairs including an initial L4–5 decompression followed by an L4–5 and L5–S1 posterior laminectomy, discectomy, and fusion at both levels because the radicular symptoms and instability.

The Commission found Dr. Volarich's medical evaluation and testimony credible and relied on those findings in awarding Claimant workers' compensation benefits. We acknowledge that Employer offered contrary expert testimony, but we defer to the Commission's choice between competing medical opinions. *See Proffer v. Fed. Mogul Corp.*, 341 S.W.3d 184, 187 (Mo. App. S.D.2011). We conclude that Dr. Volarich's testimony constituted substantial and competent evidence that Claimant's May 2003 injury caused his disability. *See Sartor v. Medicap Pharmacy*, 181 S.W.3d 627, 630 (Mo.App. W.D.2006).

Employer also argues that the Commission's decision is not supported by competent and substantial evidence because Dr. Volarich formed his opinion without knowledge of Claimant's complete medical history. In his deposition, Dr. Volarich acknowledged that, when he examined Claimant, Claimant told him he was "asymptomatic in reference to his lumbar spine in the area of which he's complaining after this injury." Claimant also failed to inform Dr. Volarich that he suffered and received treatment for a lower back injury in the 1980s when he was in the Army and was currently receiving VA disability benefits for his back and knees. After reviewing Claimant's VA and Army records, Dr. Volarich conceded that Claimant had spondylosis and degenerative disc disease in his lumbar spine prior to the May 29, 2003 accident.

The record reveals, however, that the newly disclosed information regarding Claimant's Army injury did not change Dr. Volarich's opinion as to causation. Dr. Volarich testified that, in light of the new information, he was "not changing [his]

opinion" that the May 29, 2003 accident alone and of itself caused Claimant's present disability. Also, after his deposition, Dr. Volarich reviewed Claimant's VA and Army records and discussed those records with Claimant via telephone. In a October 19, 2009 addendum to his earlier evaluation, Dr. Volarich wrote:

> After reviewing these records and speaking with [Claimant], I offer no changes to the opinions in my IME of August 28, 2008. He may have had some minor disability in his low back from the strain injuries from the mid 1980's, but it is too small to quantify since he had no hindrance in his ability to work leading up to 5/29/03. It remains my opinion that he is permanently and totally disabled as a result of the work related injury of 5/29/03 standing alone.

Based on our review of the record, we conclude that Dr. Volarich's opinion meets the standard of competent and substantial evidence. *See Kent v. Goodyear Tire & Rubber Co.*, 147 S.W.3d 865, 870 (Mo.App. W.D.2004). Point denied.

### 4. Future Medical Care

In its fourth point on appeal, Employer claims the Commission erred in awarding Claimant future medical care for his back condition. Specifically, Employer contends: (1) the award of future medical care was contrary to the overwhelming weight of the evidence, which indicates that Claimant did not require additional medical care to relieve the lumbar strain from the May 29, 2003 accident; and (2) Dr. Volarich's testimony did not constitute

---

It's noted after his second repair he continued to have a right L4–5 protrusion and a central L5–S1 protrusion. He has also been diagnosed and treated extensively for post-

laminectomy syndrome....He still has problems with the disc spaces and compression on the nerves.

competent and substantial evidence of Claimant's need for continuing treatment.[10]

■■■■■ The Missouri Workers' Compensation Act includes an allowance for future medical treatment for an injured worker, which provides in part:

In addition to all other compensation paid to the employee under this section, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury.

Mo.Rev.Stat. § 287.140.1. To receive an award of future medical benefits, a claimant must show a reasonable probability that he or she requires further medical treatment because of an injury suffered at work. *Sartor*, 181 S.W.3d at 631. An employer will be responsible for future medical benefits only if the evidence establishes to a reasonable degree of medical certainty that "the need for future medical care flows from the accident." *Lawson v. Ford Motor Co.*, 217 S.W.3d 345, 351 (Mo. App. E.D.2007) (quotation omitted).

■■■ Here, Claimant testified that he continues to experience pain in his lower back and legs.[11] At the time of the Division hearing, Claimant continued to see Dr. Lloyd and was taking numerous medi-

cations to manage his pain. Claimant testified he took Kadian, Dilaudid, Lyrica and Skelaxin, as well as sleeping pills. When asked whether Claimant would require future medical care, Dr. Volarich testified:

He needs ongoing care for his pain syndrome using medications including narcotics and non-narcotics, muscle relaxants, physical therapy, and similar treatments.

He'll require ongoing care at a pain clinic for his post-laminectomy syndrome. Epidural steroid injections, foraminal nerve root blocks, trigger point injections, TENS units, and similar treatments will be required indefinitely to control his pain syndrome as a result of the spinal surgeries that occurred as a result of the 5/29/03 accident.

Additionally, the record contains a letter from Dr. Esses, dated May 22, 2007, and a letter from Dr. Lloyd, dated September 11, 2009, both of which state that Claimant would require future medical care. Although Dr. Irvine and deGrange expressed the opinion that Claimant did not need future medical care as a result of the May 29, 2003 injury, we defer to the Commission when it resolves conflicting evidence. *See Tilley v. USF Holland Inc.*, 325 S.W.3d 487, 495 (Mo.App. E.D.2010); *Landers v. Chrysler Corp.*, 963 S.W.2d 275, 284 (Mo.App. E.D.1997). We therefore conclude that sufficient competent and substantial evidence exists to support the

---

10. Employer also contends that the award of future medical care was contrary to the overwhelming weight of the evidence because any injury caused by the May 2003 accident did not require future medical care and Dr. Volarich's testimony did not constitute competent and substantial evidence of causation. To the extent that Employer argues Claimant is not entitled to future medical benefits because he suffered a mere lumbar strain as a result of the May 2003 accident and his current disability did not "flow from" that accident, we addressed this issue in the preceding section.

11. Claimant testified: "I have pain like someone is stabbing me with a knife. I have excruciating pain down my right leg right now. It's like a stinging, burning sensation down my right leg, and I have everything from radiating, stimulating, stabbing pain that there is to be with my back associated with it. And sometimes I actually get a loud snap and a pop, and then I kind of see like lightening in my eyes."

award of future medical care.[12] Point denied.

### 5. Permanent Total Disability

In its fifth point on appeal, Employer claims the Commission erred in finding Claimant was permanently and totally disabled as a result of the May 2003 accident. Specifically, Employer contends that the overwhelming weight of the competent and substantial evidence indicates that Claimant was capable of returning to work.

▇▇▇ Whether a particular employee is permanently and totally disabled is a factual question. *Soard v. Town & Country Supermarkets*, 193 S.W.3d 446, 450 (Mo.App. S.D.2006). The term "total disability" means the "inability to return to any employment and [does] not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." Mo.Rev.Stat. § 287.020.6; *Tilley*, 325 S.W.3d at 491. The critical question in determining whether a claimant is permanently and totally disabled is "whether, in the ordinary course of business, any employer reasonably would be expected to hire the injured worker, given his present physical

condition." *ABB Power T & D Co. v. Kempker*, 236 S.W.3d 43, 48 (Mo.App. W.D.2007).

▇▇▇ Claimant presented substantial and competent evidence from which the Commission could conclude that he was permanently and totally disabled as a result of the May 2003 accident. *See, e.g., Ball–Sawyers v. Blue Springs School Dist.*, 286 S.W.3d 247, 254–55 (Mo.App. W.D.2009). The Commission found that Dr. Volarich "testified very credibly" that Claimant's injury of May 29, 2003 caused a lumbar syndrome that included disc herniations, which required multiple surgical procedures, and that Claimant continued to suffer a right L4–L5 protrusion and a central L5–S1 protrusion. In Dr. Volarich's opinion, Claimant's back and knee problems resulting from his service in the Army did not affect Claimant's ability to work prior to the May 29, 2003 accident. Based upon his examination of Claimant and review of Claimant's medical records and tests, Dr. Volarich concluded: "It is my opinion that [Claimant] is permanently and totally disabled as a direct result of the work-related injuries sustained in the 5/29/03 accident standing alone."[13] James

12. Employer argues that Dr. Volarich's testimony did not constitute competent or substantial evidence to support the award of medical treatment because Dr. Volarich based his opinion on an incomplete medical history. However, Dr. Volarich specifically stated that the "fact that [Claimant] had a lumbosacral sprain prior to 1986" did not affect his opinion that Claimant required future medical care as a result of the May 29, 2003 work accident.

13. Dr. Volarich also restricted Claimant as follows:

With regard to work and other activities referable to the spine,

1. He is advised to avoid all bending, twisting, lifting, pushing, pulling, carrying, climbing and other similar tasks.
2. He should not handle any weight greater than 10–15 pounds, and limit this task

to an occasional basis assuming proper lifting techniques.
3. He should not handle weight over his head or away from his body, nor should he carry weight over long distances or uneven terrain.
4. He is advised to avoid remaining in a fixed position for any more than about 15 minutes at a time including both sitting and standing.
5. He should change positions frequently to maximize comfort and rest when needed including resting in a recumbent fashion.
6. He is advised to pursue an appropriate stretching, strengthening, and range of motion exercise program in addition to non-impact aerobic conditioning such as walking, biking or swimming to tolerance daily.

England, a rehabilitation counselor, examined Claimant and reviewed Claimant's medical history and similarly concluded that, based on his own observations and Dr. Volarich's restrictions, Claimant would not be able to compete successfully for employment or sustain any work in the long run. The Commission also found Mr. England's testimony "very credibl[e]." "Credibility of the testimony, including medical opinions, is for the [C]ommission's determination." *Reed v. Associated Elec. Co-op., Inc.*, 302 S.W.3d 693, 702 (Mo.App. S.D.2009). Point denied.

### 6. *Compensation*

▬▬ In its sixth and final point on appeal, Employer claims the Commission erred in finding Claimant's weekly wage was $1,312.32, resulting in a rate of $649.32 per week for TT/PTD and $340.12 for PPD. Specifically, Employer contends that the Commission improperly calculated Claimant's earnings because it deducted as a business expense a pro rata share of the tractor's depreciation rather than the total yearly depreciation amount as represented in Claimant's 2003 tax return.

▬▬ Section 287.250 governs calculation of the proper compensation rate, which is based on an injured employee's average weekly earnings. Mo.Rev.Stat. § 287.250.1. Under Section 287.250.2, "any money paid by the employer to the employee to cover any special expenses incurred by the employee because of the nature of the employment shall not be included in wages." Where an employer engages an individual to furnish and drive a track, the driver's expenses, including depreciation of the track, are considered "special expenses" and are not included in the employee's earnings. *Swallow*, 894 S.W.2d at 234; *Reed v. Kansas City Wholesale Grocery Co.*, 236 Mo.App. 402, 156 S.W.2d 747, 752 (1941).

The Commission explained its calculations as follows:

> Claimant filed income tax [sic] for the year of 2003, Form 1040 shows he had a gross amount of payment from [Employer] in the amount of $37,908 for 15 weeks of work from February 6, 2003, to the date of injury of May 29, 2003. Thus, Claimant's gross receipts of $37,908 minus $1,164 cost of goods, $9,971 of other expenses, and $7,188.25 which amounts to 15 weeks pro rata depreciation. Thus, Claimant had net earnings of $19,684.75 for 15 weeks, which amounts to $1,312.32 per week which amounts to TTD and PTD in the amount of $649.32 per week and a permanent partial disability rate of $340.12.

Employer acknowledges that the Commission properly subtracted from Claimant's 15-week amount gross receipt of $37,908 the $1,164 for costs of goods and $9,971 for other expenses. Employer, however, challenges the Commission's subtraction of a pro rata depreciation of the tractor.

In his 2003 income tax return, Claimant subtracted the full depreciation expense of his tractor from his gross business income. The amount Claimant reported as the full depreciation was $24,640. Instead of subtracting the full depreciation amount from Claimant's gross receipts, the Commission subtracted $7,188.25, which represents 15 weeks of pro rata depreciation on the tractor. Employer cites no Missouri authority supporting the proposition that, where a claimant deducts the full accelerated amount of depreciation in his income tax return, the Commission must use the full accelerated amount and not the pro rata depreciation figure in calculating the claimant's weekly wage and compensation rate. We review the Commission's decision to determine if it contains sufficient competent and substantial evidence to support the award. *Cardwell v. Treasurer,*

249 S.W.3d 902, 906 (Mo.App. E.D.2008). Based on our standard of review, we are unable to conclude that the Commission erred in arriving at the compensation rate applicable to this claim. Point denied.

### Conclusion

The Commission's award is affirmed.

GARY M. GAERTNER, JR., P.J., and MARY K. HOFF, J., concur.